ASSET PURCHASE AGREEMENT

by and amongst

Bow Holdings, Inc.,

a Wyoming corporation, and

Industrial Commercial Electrical, Inc.

a Massachusetts corporation,

I.C.E. Management Corp.,

a Massachusetts corporation, and

I.C.E.-Conn, Inc.,

a Connecticut corporation.

3/31/03

ASSET PURCHASE AGREEMENT

This *Asset Purchase Agreement* ("Agreement"), dated as of the 31st day of March, 2003, is made by and amongst Bow Holdings, Inc., a Wyoming Corporation ("Buyer") and Industrial Commercial Electrical, Inc., I.C.E. Management Corp., each a Massachusetts corporation, and I.C.E.-Conn, Inc., a Connecticut corporation (collectively, "Sellers").

RECITALS

WHEREAS, Sellers are engaged primarily in the business of installing, servicing, and maintaining low and high voltage electrical wiring systems, low voltage electrical data and communication wiring systems, and commercial sound systems (hereinafter referred to as the "Business"); and

WHEREAS, on September 6, 2002, Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts, Western Division (the "Bankruptcy Court"), jointly administered under Case No. 02-45451-JBR (the "Bankruptcy Case"); and

WHEREAS, Buyer desires to purchase substantially all of Sellers' assets relating to the Business from Sellers as further described herein, and Sellers desire to sell such assets to Buyer, upon the terms and subject to the conditions set forth in this Agreement.

AGREEMENT

The parties to this Agreement, intending to be legally bound thereby, agree and covenant as follows:

SECTION 1. DEFINITIONS.

As used in this Agreement, and in addition to the terms which are otherwise defined within the body of this Agreement, the following terms shall have the meanings set forth below. Any such capitalized terms not specifically defined herein shall have the meanings ascribed to such terms by the Bankruptcy Code:

"Accounts" shall mean all rights of Sellers to payment arising prior to the Closing Date for the following: (i) Accounts Receivables (as defined herein); (ii) notes, bills, drafts, acceptances, instruments, documents and other debts, obligations and liabilities, in whatever form, owing to Sellers with respect thereto; (iii) all guaranties and security therefor, and Sellers' rights pertaining to and interest in such goods, including the right of stoppage in transit, replevin, or reclamation; (iv) all chattel paper; (v) all other rights and claims to the payment of money, under contracts or otherwise; and (vi) all other property constituting "accounts" as such term is defined in Section 9-106 of the Uniform Commercial Code;

"Accounts Receivables" shall mean all rights of Sellers to payment arising prior to the Closing Date and recorded on Sellers' books and records for goods sold or leased, and for services rendered, and all sums of money or other proceeds due thereon;

*3/31/03*

"Bid Order" shall mean an order of the Bankruptcy Court: (i) approving the procedures for the submission of counteroffers as described in Section 14 of this Agreement; (ii) scheduling the earliest possible date for a hearing on the approval of the sale contemplated in this Agreement; and (iii) approving the terms and notice of the sale to be delivered to creditors and potential bidders;

"Business Day" shall mean any day other than Saturday, Sunday, and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close;

"Excluded Assets" shall mean, notwithstanding any other provision of this Agreement: (i) any of the rights of Sellers under this Agreement; (ii) all cash, deposit accounts, certificates of deposit, and all other cash equivalents in the possession of Sellers on the Closing Date (as herein defined); (iii) all security deposits of any kind paid to and held by any third party; (iv) all rights to state, local, or federal tax refunds, rebates, or abatements arising prior to the Closing Date; (v) Sellers' right, title, and interest in and to that certain *Private Company Directors and Officers Liability Policy*, Policy No. 103839044, and any proceeds thereof; (vi) all claims, defenses, objections, or causes of action of Sellers arising under Sections 502, 505, 506, 507, 509, 510, 542, 543, 544, 545, 547, 548, 549, 550, 553, or 558 of the Bankruptcy Code; (vii) all claims and causes of action of Sellers as and against David P. LeBlanc and/or Daniel J. Kennedy, both individually, and in their capacities as officers and directors of Sellers; (viii) all claims and causes of action of Sellers as and against New Horizons Technologies, Inc. and/or Kenneth J. Babineau, individually, and in his capacity as an officer and director of Sellers; (ix) all claims and causes of action of Sellers as and against any accountants or other financial professionals employed or engaged by the Sellers prior to the Closing Date; (x) all currently pending causes of action of Sellers as and against any person or entity; and (xi) that certain tax refund in the amount of $135,000.00 due and owing to Sellers by the Internal Revenue Service for fiscal year 2002.

"Purchased Assets" shall mean: (i) Sellers' Accounts; (ii) all of Sellers' furniture, fixtures, equipment, and any other tangible assets; (iii) trademarks (whether registered or unregistered) and service mark rights in the name of any of the Sellers, all trade names, brand names, domain names, logos, processes, methods, trade secrets, customer lists, contracts, product specifications, designs, technical information and other intellectual and/or intangible property and all software owned by or licensed to Sellers, including without limitation, billing and accounting software, and all other software required to operate the Business; (iv) websites, any information hosted on such websites, including any intellectual property associated therewith; (v) toll free numbers operated by Sellers; and (vi) any other property not specifically excluded from the sale pursuant to the terms of this Agreement;

"Sale Order" shall mean an order of the Bankruptcy Court which shall provide, among other things and without limitation, that: (i) the sale of the Purchased Assets to Buyer, in accordance with the terms and conditions of this Agreement and pursuant to, among others, Section 363 of the Bankruptcy Code, is approved; (ii) the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and

2

*initials*
3/31/03

fair consideration for the Purchased Assets; (ii) Buyer is a good faith purchaser of the Purchased Assets, as that term is used in Section 363(m) of the Bankruptcy Code, and is entitled to the protections provided by such section; and (iv) the sale and transfer of the Purchased Assets to Buyer shall vest Buyer with all right, title, and interest to the Purchased Assets free and clear of all liens, claims, and encumbrances.

SECTION 2. PURCHASE AND SALE OF THE PURCHASED ASSETS; ASSUMPTION OF LIABILITIES.

SECTION 2.1. Transfer of Assets. Subject to the terms and conditions herein set forth and pursuant to, among others, Sections 105 and 363 of the Bankruptcy Code, Sellers shall sell, convey, transfer, assign, and deliver to Buyer, and Buyer shall purchase and accept from Sellers, on the Closing Date, all right, title, and interest of Sellers in and to the Purchased Assets, wherever located.

SECTION 2.2. Sale at Closing Date. The sale, transfer, assignment, and delivery by Sellers of the Purchased Assets to Buyer as herein provided, shall be effected on the Closing Date by bills of sale, assignments, and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Buyer.

SECTION 2.3. Assumption of Liabilities. Except as otherwise provided in this Section 2.3, Sellers acknowledge and agree that Buyer will not assume any of Sellers' obligations of any nature, whether absolute, accrued, contingent, or otherwise, known or unknown, liquidated or unliquidated, whether due or to become due and whether or not required to be reflected or reserved against on a balance sheet under generally acceptable accounting principles, and the sale to Buyer is to be free and clear of any and all claims that arose prior to Closing. Notwithstanding the foregoing, Buyer acknowledges and agrees that it shall assume and perform all obligations expressly assumed pursuant to Section 4 herein.

SECTION 3. PURCHASE PRICE.

SECTION 3.1. Purchase Price. Subject to Section 3.5 herein, the consideration for the sale and transfer of the Purchased Assets is Two Hundred Ninety-Five Thousand Dollars ($295,000.00) in cash (the "Purchase Price"), which price is payable and deliverable in accordance with this Section 3.

SECTION 3.2. Fee Payment; Deposit. Sellers acknowledge that Buyer has delivered to Sellers, and Sellers have received from Buyer, the sum of Twenty Thousand Dollars ($20,000.00) in cash (the "Fee") which is to be credited toward Buyer's payment of the Purchase Price. Subject only to Section 4(b) herein, Buyer acknowledges that, as a material inducement for Sellers to enter into this Agreement, the Fee is not refundable to Buyer and further that payment of the Fee creates no obligation of Sellers of any kind to Buyer. Upon the execution of this Agreement, Buyer shall deposit with counsel to Sellers the sum of Eighty Thousand Dollars ($80,000.00) in cash (the "Deposit"), which shall be held by counsel to Sellers in an escrow account subject to the jurisdiction of the Bankruptcy Court and distributed pursuant to the terms of this Agreement.

*[initials]*
*3/31/03*

SECTION 3.3. Payment of Purchase Price. The payment for the Purchased Assets shall be made as follows:

(a) On the Closing Date, Buyer shall deliver to counsel to Sellers the sum of One Hundred Ninety-Five Thousand Dollars ($195,000.00) in cash, or such other amount as is necessary to pay the Purchase Price, as adjusted in accordance with Section 3.5.

(b) Buyer shall pay all sums due to Sellers hereunder by certified check or by wire transfer of immediately available funds to a bank account that counsel to Sellers shall designate in writing to Buyer, which designation shall be made at least two (2) Business Days prior to the Closing Date.

SECTION 3.4. Allocation of Purchase Price. The Purchase Price shall be allocated to the purchase of the Purchased Assets as follows:

(a) Subject to Section 3.5 herein, One Hundred Fifty Thousand Dollars ($150,000.00) for Sellers' Accounts Receivables (the "Accounts Receivables Allocation");

(b) Twenty-Two Thousand Five Hundred Dollars ($22,500.00) for Sellers' furniture, fixtures, equipment, and other tangible assets;

(c) Twenty-Two Thousand Five Hundred Dollars ($22,500.00) for Sellers' inventory; and

(d) One Hundred Thousand Dollars ($100,000.00) for all other of Sellers' tangible and intangible assets.

SECTION 3.5. Adjustment of Purchase Price. Notwithstanding Section 3.4(a) herein, Sellers acknowledge that Buyer allocated $150,000.00 of the Purchase Price to the Accounts Receivables by estimating that, of the Accounts Receivables recorded on Sellers' books and records on March 27, 2003, only Two Hundred Thousand Dollars ($200,000.00) of those Accounts Receivables would be collectible by Buyer (the "Collectible Accounts Receivables"). Therefore, Sellers acknowledge that some portions of the Accounts Receivables recorded on Sellers' books and records on March 27, 2003 may be uncollectible or otherwise difficult to collect. Based upon the foregoing, the parties agree that the Purchase Price shall be adjusted as follows:

(a) the Collectible Accounts Receivables shall be reduced by the amount of Accounts Receivables collected by Sellers, if any, between the date of this Agreement and the Closing Date (e.g. $200,000.00 – proceeds of Accounts Receivables) (the "Closing Accounts Receivables"); and

(b) the Accounts Receivables Allocation, as adjusted pursuant to this Section 3.5, shall be 75/100ths of the Closing Accounts Receivables (e.g. [$200,00.00 – proceeds of Accounts Receivables)] x 0.75).

As of the date of this Agreement, Sellers Accounts Receivables had a book value of $297,910.00. Upon the execution of this Agreement, Sellers shall not, with the exception of recording payments, make any further record entries with respect to the Accounts Receivables. The parties agree that Sellers shall create new accounts receivables to record

4

*[handwritten initials]*
*3/31/03*

all amounts due to Sellers for Business conducted between the date of this Agreement and the Closing Date ("Interim Accounts Receivables"). To the extent that Buyer funds the Business pursuant to Section 4(a) herein, the Interim Accounts Receivables created by Buyer's funding of the Business shall not affect the Purchase Price, and any such Interim Accounts Receivables shall be the property of Buyer. The parties further agree, however, that to the extent that Sellers fund the Business, or any portion thereof, any Interim Accounts Receivables created by Sellers funding of the Business shall be the property of Sellers that shall be purchased by Buyer at the Closing for the amount of 90/100ths of the book value of such Interim Accounts Receivables as of the Closing Date.

SECTION 4. INTERIM FUNDING OF SELLERS' OPERATIONS.

(a) Buyer's Funding of Business Until Closing Date. Buyer acknowledges and agrees that Sellers are in need of funding to continue the Business which the Buyer acknowledges and agrees is necessary to preserve the value of the Purchased Assets. Based upon the foregoing, Buyer agrees, beginning on the date of this Agreement, to pay all costs and expenses associated with the continuation of the Business until the Closing Date. As such, Buyer agrees to honor and to pay all unpaid invoices pertaining to the Business arising between the date of this Agreement and the Closing Date. Buyer acknowledges and agrees that any amounts paid pursuant to Section 4(a) will be paid to preserve the going concern value of the Purchased Assets for the sole benefit of Buyer and shall not be applied as a credit against the Purchase Price. Notwithstanding the foregoing, in no event shall Buyer's funding of the Business pursuant to this Section 4(a) exceed Eight Thousand Five Hundred Dollars ($8,500.00) per week.

(b) Reimbursement in Event of Termination. The parties agree that in the event this Agreement is terminated pursuant to Section 13.1(c) herein, Buyer shall be entitled to reimbursement from the proceeds of the Auction of the sum of: (i) the Fee; (ii) the Deposit; and (iii) those amounts paid by Buyer pursuant to Section 4(a) herein.

SECTION 5. CLOSING.

The closing hereunder (the "Closing") shall take place at the offices of Aframe, Barnhill & von Timroth, P.A., One Exchange Place, Worcester, Massachusetts 01608, at 12:00 p.m. on the first Business Day following the entry of the Sale Order provided that there is no stay pending appeal of such Sale Order, or on such other date and at such other place and time as may be mutually agreed upon in writing by the parties hereto (the "Closing Date"). In no event shall the Closing take place subsequent to April 21, 2003.

SECTION 6. REPRESENTATIONS AND WARRANTIES OF SELLERS.

As of the date hereof, Sellers hereby represent and warrant to Buyer (which representations and warranties shall not survive the Closing) that:

SECTION 6.1. Corporate Organization. Sellers are duly organized and validly existing under the laws of the jurisdiction of their organization.

*JH*
*3/31/03*

5

SECTION 6.2. Acknowledgments of Buyer. BUYER HEREBY ACKNOWLEDGES THAT THE PURCHASED ASSETS ARE BEING PURCHASED AS IS, AND WHERE IS. SELLERS HEREBY DISCLAIM ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

SECTION 7. REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer hereby represents and warrants to Sellers as follows:

SECTION 7.1. Corporate Organization. Buyer is a Wyoming Corporation duly organized, validly existing and in good standing under the laws of jurisdiction of its formation.

SECTION 7.2. Authorization and Validity of Agreement. Buyer has all requisite authority to enter into this Agreement and to carry out its obligations hereunder. The execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been duly authorized by all necessary action of Buyer, and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery, and performance. This Agreement has been duly executed by Buyer and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 7.3. No Conflict or Violation. The execution, delivery and performance by Buyer of this Agreement do not and will not violate or conflict with any provision or purpose of Buyer and do not and will not violate any provision of law, or any order, judgment, or decree of any court or governmental entity applicable to Buyer.

SECTION 8. COVENANTS OF SELLERS.

Seller covenants as follows:

SECTION 8.1. Conduct of Business Before Closing Date. Unless otherwise consented to in writing by Buyer, between the date hereof and the Closing Date, Sellers shall, subject to the provisions of the Bankruptcy Code, operate the Business in the ordinary course consistent with current practice, subject to the terms and conditions contained in this document.

SECTION 8.2. Access to Properties and Records Confidentiality; Delivery of, and Access to, Information.

(a) Upon execution of this Agreement, Sellers shall afford to Buyer, and to the accountants, counsel, and representatives of Buyer, reasonable access during normal business hours throughout the period prior and after the Closing Date (or the earlier termination of this Agreement pursuant to Section 13) to all books, accounts records and operations of Sellers relating to the Purchased Assets. The rights of access contained in this Section 8.2 are granted subject to, and on, the following terms and conditions: (i) any such investigation will be conducted in such a manner as not to interfere unreasonably with the operation of the Business; (ii) during the period from the date hereof to the Closing Date, all information provided to Buyer or its representatives by or on behalf of the Seller

6

*ook*
3/31/03

or its representatives (whether pursuant to this Section 8.2 or otherwise) will be governed and protected by a Confidentiality Agreement to be executed by and between Sellers and Buyer; (iii) such right of access shall not limit in any manner Sellers' right to undertake actions necessary to ensure the safety and security of its employees and property; and (iv) where reasonably possible, the identity of all persons designated by Buyer to enter Sellers' place of business pursuant to this section shall be disclosed to Seller in advance along with the dates of access to Sellers' place of business sought by each such person.

(b) Following the Closing, Buyer shall afford Sellers, or their duly appointed successor under any plan of reorganization or liquidation, and Flagship Bank & Trust Co. with access to books and records acquired by Buyer under this Agreement for a period of 180 days. Sellers or their duly appointed successors shall be subject to the terms and conditions contained in Section 8.2(a) of this document.

SECTION 8.3. Further Assurances. Upon the request and at the expense of Buyer at any time after the Closing Date, and until such date as Sellers (and any of their representatives, or successors, including any subsequently appointed trustee or liquidating agents) continues to be available in such capacity, Sellers shall execute and deliver such other documents as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

SECTION 8.4. Reasonable Efforts. Upon the terms and subject to the conditions of this Agreement, Sellers will, subject to any orders of the Bankruptcy Court and the Bankruptcy Code, use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective the transactions contemplated hereby including, without limitation, all commercially reasonable actions required to be taken by the Seller to obtain the Bankruptcy Court's entry and approval of the Bid Order and the Sale Order, including seeking the entry of an order limiting the period of notice of any final hearing on the approval of the transactions contemplated hereby.

SECTION 8.5. Bankruptcy Court Approval. Within five (5) Business Days following the execution of this Agreement, Sellers shall file a motion with the Bankruptcy Court seeking approval of the Bid Order in accordance with the terms and conditions set out in this Agreement and the transactions contemplated hereunder ("Approval Motion").

SECTION 8.9. Rejection of Contracts. Except upon the written request of Buyer made within three days of the date of this Agreement and accompanied by any amounts as may be required to be paid pursuant to Bankruptcy Code § 365 to cure any defaults with regard to any executory contracts or unexpired leases to which Sellers are a party, Sellers shall immediately seek leave to reject and/or terminate any executory contracts or unexpired leases to which Sellers are a party. Within one day of signing this agreement, Seller shall deliver to Buyer all executory contracts and unexpired leases in order to enable Buyer to exercise his right under this Section 8.9.

*DH*
3/31/03

SECTION 9. COVENANTS OF BUYER.

SECTION 9.1. Adequate Capitalization. Within three (3) days of the date of this Agreement, Buyer shall have cash on hand in a quantity sufficient to pay the Purchase Price, as adjusted in accordance with Section 3.5 and shall provide documentation or other evidence of the amount of and the location of such cash. Buyer further agrees that, during the period beginning on the date of this Agreement and ending on April 21, 2003, that it shall not transfer or otherwise relocate the cash that will be used to pay the Purchase Price. For the purposes of this Section 9.1, the term "relocate" shall mean to move funds outside of the financial institution in which they are then deposited, *provided, however,* that Buyer may, upon written notice to Sellers, move funds into different accounts within the same financial institution for interest earning purposes.

SECTION 9.2. Actions Before Closing Date. Buyer shall not take any action which shall cause it to be in breach of any representations, warranties, covenants, or agreements contained in this Agreement. Buyer shall use commercially reasonable efforts to perform and satisfy all conditions to Closing to be performed or satisfied by Buyer under this Agreement as soon as possible, but in no event later than the Closing Date.

SECTION 9.3. Consents and Approvals. Subject to Sellers' obligation to cooperate as set forth in Section 8.2, Buyer acknowledges that it is assuming all responsibility to obtain, or for any failure (by Buyer or Seller) to obtain, any consent or approval of this transaction from any government agency and that the failure to obtain such consents or approvals shall not be a condition to Closing. Seller warrants that to the best of its knowledge, the Business is currently in compliance with all government regulations.

SECTION 9.4. Reasonable Efforts. Upon the terms and subject to the conditions of this Agreement, Buyer will use commercially reasonable efforts to take, or cause to be taken, all action reasonably necessary and consistent with applicable law, to consummate and make effective the transactions contemplated hereby including, without limitation, all actions to be taken to obtain the Bankruptcy Court's entry of the Sale Order.

SECTION 10. TERMINATION OF REPRESENTATIONS, WARRANTIES AND COVENANTS.

All representations, warranties, and covenants of Sellers contained in this Agreement shall terminate as of the Closing Date.

SECTION 11. CONDITIONS PRECEDENT TO PERFORMANCE BY SELLERS.

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions:

SECTION 11.1. Representations and Warranties of Buyer. All representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for failures to be true and correct that do not result in a material adverse effect on

*[signature]*
*3/31/03*

Buyer's ability to execute and deliver this Agreement or its ability to perform its obligations hereunder.

SECTION 11.2. Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

SECTION 11.3. Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order, and no order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

SECTION 12. CONDITIONS PRECEDENT TO THE PERFORMANCE BY BUYER.

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (except for the conditions set forth in Section 12.5 of this Agreement) may be waived by Buyer in its sole discretion:

SECTION 12.1. Representations and Warranties of Sellers. All representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Sellers on and as of such date, except for failures to be true and correct that do not result in a material adverse effect on Sellers' ability to perform its obligations hereunder.

SECTION 12.2. Performance of the Obligations of Sellers. Sellers shall have performed in all material respects all obligations required under this Agreement to be performed by them on or before the Closing Date.

SECTION 12.3. [Intentionally Omitted].

SECTION 12.4. Entry of the Bid Order. (i) The Bankruptcy Court shall have entered the Bid Order; and (ii) no order staying, reversing, modifying, or amending the Bid Order shall be in effect on the Closing Date.

SECTION 12.5. Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date.

SECTION 12.6. Bill of Sale. Sellers shall have executed in favor of Buyer or Buyer's nominee an acceptable bill of sale which shall be delivered to Buyer's counsel.

SECTION 13. TERMINATION.

SECTION 13.1. Conditions of Termination. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time before the Closing:

(a) By mutual written consent of Sellers and Buyer;

(b) By Sellers, if Buyer is the successful bidder at the Auction, and Buyer fails (through no fault of Seller) to timely close the transactions contemplated hereunder;

*[initials] 3/31/03*

(c) By Buyer, upon approval by the Bankruptcy Court of any transaction based upon a Superior Bid (as defined herein), this Agreement shall be deemed terminated (subject to the parties' rights and obligations in the event of a termination); or

(d) In any event, April 21, 2003.

If Buyer or Seller terminates this Agreement pursuant to the provisions hereof, such termination shall be effected by written notice to the other party specifying the provision hereof pursuant to which such termination is made.

SECTION 13.2. Effect of Termination; Remedies.

(a) In the event of termination pursuant to Section 13.1, this Agreement shall become null and void and have no effect (other than Sections 4, 7, 8.2(a), 9.1, 13, and 15 which shall survive termination), with no liability on the part of Sellers or Buyer, or their respective directors, officers, employees, agents, members, managers, or stockholders, with respect to this Agreement, except for liability as provided below in Section 13.2(b).

(b) If this Agreement is terminated:

(i) By Buyer and Sellers, pursuant to Sections 13.1(a), the Deposit shall be returned to Buyer;

(ii) By Seller, pursuant to Section 13.1(b), Sellers shall, in addition to any remedies Sellers may have at law or equity against Buyer, be entitled to retain the Deposit and any interest accrued thereon, and shall have no liability whatsoever to Buyer for any amounts paid by Buyer pursuant to Section 4 herein; and

(iii) By Buyer, pursuant to Sections 13.1(c), the Fee, the Deposit, and all amounts paid by Buyer pursuant to Section 4(a) herein shall be returned to Buyer.

SECTION 14. BIDDING PROCEDURES.

SECTION 14.1. Other Bids.

(a) Bankruptcy Court Approval. Within five (5) Business Days after the execution of this Agreement, Sellers will seek the approval of the Bankruptcy Court with respect to the bidding procedures set forth in this Section 14.

(b) Competitive Bid Procedure. Buyer and Sellers acknowledge that this Agreement is being entered into subject to another party offering a higher and better bid ("Superior Bid") for the Purchased Assets. Buyer and Sellers acknowledge that Sellers have an obligation to solicit higher and better offers and to market the Purchased Assets. Subject to Bankruptcy Court approval, the terms of the Competitive Bid Procedure shall include the following:

(i) a competing bid shall be accompanied by a certified check or cash deposit in the amount of One Hundred Thousand Dollars ($100,000.00), which shall be held in escrow by counsel for Sellers and, if such competing bid is accepted and approved by the Bankruptcy Court, shall be applied toward the Purchase Price, as adjusted pursuant to Section 3.5 herein, or, if such competing bid is not accepted, shall be refunded in full to such competing bidder after the Sale

*initials* 3/31/03

Hearing (unless such competing bidder has breached or violated its agreement with Seller);

(ii) a competing bid must be at least Fifteen Thousand Dollars ($15,000.00) in excess of the sum of the Purchase Price, as adjusted pursuant to Section 3.5 herein, and all amounts paid by Buyer pursuant to Section 4 herein; and

(iii) a competing bid shall not be subject to any further due diligence by the competing bidder and shall not contain any other conditions precedent to the consummation of the purchase other than the conditions precedent contained in this Agreement, and the bid must state that the competing bidder is prepared to consummate the purchase on terms no less favorable to Sellers than those contained in this Agreement, and within the same time as provided in Section 5 herein.

(c) Auction. In the event that Sellers receive a competing bid that meets the terms set forth Section 13.1(b) and is otherwise acceptable to Sellers (a "Qualified Counteroffer"), Sellers shall conduct a sealed bid auction (the "Auction") at the Sale Hearing under the direction and supervision of the Bankruptcy Court. No person or entity other than Buyer or a bidder that has made a Qualified Counteroffer shall be entitled to participate in the Auction. The Auction shall be subject to such other terms and conditions as the Bankruptcy Court shall require.

SECTION 15. MISCELLANEOUS.

SECTION 15.1. Successors and Assigns. Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

SECTION 15.2. Governing Law; Jurisdiction. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the Commonwealth of Massachusetts (without giving effect to the principles of conflicts of laws thereof), except to the extent that such laws are superseded by the Bankruptcy Code. The parties hereto irrevocably elect the Bankruptcy Court as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction thereof.

SECTION 15.3. Expenses. Except as otherwise provided herein, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

SECTION 15.4. Broker's and Finder's Fees. Each of the parties represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement, and, insofar as such party knows, no other broker or other Person is entitled to any commission or fee in connection with any of these transactions.

3/31/03

SECTION 15.5. Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

SECTION 15.6. Notices. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service if served personally on the party to whom notice is to be given; (ii) on the day of transmission if sent via facsimile transmission to the facsimile number given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, as follows:

to Sellers at:

Mr. David P. LeBlanc
Industrial Commercial Electrical, Inc.
9 Short Street
Worcester, Massachusetts 01608
facsimile: (508) 754-3892

with a copy to counsel to Sellers:

Carl D. Aframe, Esq.
Aframe, Barnhill & von Timroth, P.A
One Exchange Place
Worcester, Massachusetts 01608
facsimile: (508) 753-8219

and with a copy to counsel to the Creditor's Committee:

Michael J. Fencer, Esq.
Jager Smith P.C.
One Financial Center
Boston, Massachusetts 02111
facsimile: (617) 951-2414

*[initials]*
3/31/03

12

and with a copy to counsel to Flagship Bank & Trust Co.:

Richard A. Sheils, Jr., Esq.
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, Massachusetts 01615-0156
facsimile: (508) 929-3047

and to Buyer at:

Mr. Mark Kwedor
Bow Holdings, Inc.
c/o William J. Burns, Esq.
P.O. Box 21263
Boston, Massachusetts 02106
facsimile: (781) 963-5877

Any party may change its address for the purpose of this Section 15.6 by giving the other party written notice of its new address in the manner set forth above.

SECTION 15.7. Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by each and all of the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation, or warranty of this Agreement.

SECTION 15.8. Parties in Interest. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third persons to Seller or Buyer. No provision of this Agreement shall give any third persons any right of subrogation or action over or against Seller or Buyer.

13

*[initials]*
3/31/03

SECTION 15.9. Commercially Reasonable Efforts. No reference in this Agreement to "commercially reasonable efforts" shall require a person obligated to use commercially reasonable efforts to pay money or give other consideration, to incur unreasonable out-of-pocket expenses or to institute or threaten to institute litigation.

SECTION 15.10. Section and Paragraph Headings. The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

SECTION 15.11. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. The parties further agree that this Agreement may be executed by facsimile signature.

SECTION 15.12. Entire Agreement. This Agreement contains the entire understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

[*Remainder of page intentionally left blank.*]

14

*[handwritten initials]*
3/31/03

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

INDUSTRIAL COMMERCIAL ELECTRICAL, INC.

By: _*David P. LeBlanc - President* 3/31/03_
David P. LeBlanc, President

I.C.E. MANAGEMENT CORP.

By: _*David P. LeBlanc - President* 3/31/03_
David P. LeBlanc, President

I.C.E. - CONN, INC.

By: _*David P. LeBlanc - President* 3/31/03_
David P. LeBlanc, President

BOW HOLDINGS, INC.

By: _____
Mark Kwedor, President

15

**Industrial Commercial Electrical Corp., Inc.**

Weekly Time Sheet

Employee: Donald D. Richard   No. 146   Week Ending 3/20/04

| DATE | JOB NO. | CUSTOMER/LOCATION | Time Arrived on Job | Time Departed Job | Hours on the Job | Hours traveled to Job | Hours traveled from Job | Total travel time | Days or Nights Worked? Number of Nights Stayed |
|---|---|---|---|---|---|---|---|---|---|
| 3-15 | 4947 | SHOP | 8 AM | 5 PM | 9 | | | | |
| 3-16 | | SHOP | 7:00 | 4:30 | 9.5 | | | | |
| 3-17 | | SHOP | 7:30 | 5:00 | 9.5 | | | | |
| 3-18 | | SHOP | 8:00 | 4:00 | 8 | | | | |
| 3-19 | | SHOP | 7:00 | 12:00 | 5 | | | | |

Total Hrs. Worked: 41
Total Hrs. Traveled:

40 reg
1.0 OT
4947 40
4947

W/C 0605+



EXHIBIT 1
6-31-04 Richard

**Industrial Commercial Electrical Corp., Inc.**
**MILEAGE LOG**

Employee: DONALD RICHARD  Employee Number: 244

WEEK ENDING 3-20-03

| DATE: | 3-15 | 3-16 | 3-17 | 3-18 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Location: Start | Shop | Shop | Shop | Shop | | | | | | | |
| Location: End | Home | Home | Home | Home | | | | | | | |
| Odometer: Start | 101820 | 101460 | 101600 | 101740 | | | | | | | |
| Odometer: End | 101460 | 101600 | 101740 | 101880 | | | | | | | |
| Total Miles | 100 | 140 | 140 | 140 | | | | | | | |
| JOB # | | | | | | | | | | | |
| Supervisor | | | | | | | | | | | |
| TOTALS | -60 -60 40 | -60 80 | -60 80 | -60 80 | | | | | | | |

Super. Initials: _____
Approval Initials: _____

Employee Initials: [signature]

EXHIBIT 2 6-21-04 Richard

## INDUSTRIAL COMMERCIAL ELECTRICAL CORPORATION, INC.

PO Box 987
WORCESTER, MA 01613

TEL. (508) 754-3077 FAX (508) 754-3892

May 5, 2004

Mr. Don Richards
70 Gardner Road
Winchendon, MA 01475

Re: Termination

Dear Mr. Richards:

This letter will serve to memorialize that on Friday, April 16, 2004, ICE terminated the employer-employee relationship it had with you. As grounds for this termination, ICE alleges the following:

1) On your time sheet for the week ended March 19, 2004, you reported that you had worked in the shop, when, in fact you did not.

2) Subsequent to your submission of this time sheet, we asked you to supply the address where you indeed worked. You refused to supply this information.

3) ICE believes that you utilized company materials to conduct your work at this unauthorized location. When you were informed that use of such materials constitutes theft, you still refused to reveal the address.

4) When it was explained to you about the importance of ICE recovering its property, you still refused to supply the Company with an address.

5) Finally, you admitted to receiving funds for work performed which you did not remit to ICE and that you also received a paycheck from ICE.

In short, ICE has terminated you for gross misconduct. ICE will be reporting this to the Department of Employment and Training and may seek criminal and civil sanctions against you.

In order for you to receive the recompense owed you, you must return all tools, materials and other Company property in your possession.

If you have any questions, you or your attorney can contact me at 781-961-6787.

Sincerely,

William J. Burns

Cc: Mr. Dave LeBlanc
    Mr. Karl Walsh
    Mr. Dwayne LeBlanc
    Mr. Michael Scanlon