UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONALD J. RICHARD )<br>   Plaintiff )<br>)<br>v. )<br>)<br>INDUSTRIAL COMMERCIAL )<br>ELECTRICAL CORPORATION )<br>   Defendant )<br>) | CIVIL ACTION NO. 04-40066 NMG |

### AFFIDAVIT IN SUPPORT OF ATTACHMENTS

I, Donald J. Richard of Winchendon, Massachusetts on oath, depose and say that pursuant 29 U.S.C., Sec. 1132(g), I was awarded reasonable attorney fees and costs as a result of my suit for continuation of my coverage as a qualified beneficiary under the health insurance provided by the Defendant (COBRA). The Defendant has significant assets to satisfy the judgment but the judgment and execution remain unsatisfied. I believe that the Defendant's action is in retaliation of my prevailing and has no intention of paying my attorney fees that were awarded me, and unless the attachment are allowed ex parte I will not be paid.

Signed under the pains and penalties of perjury this 11-2-05 day of November, 2005.

*Donald Richard*

Donald J. Richard

*Ex A*

United States District Court
District of Massachusetts

|   |   |
|---|---|
| DONALD J. RICHARD,<br>     Plaintiff,<br><br>v.<br><br>INDUSTRIAL COMMERCIAL ELECTRICAL<br>CORPORATION,<br>     Defendant. | Civil Action No.<br>04-40066-NMG |

**MEMORANDUM OF DECISION**

**Gorton, J.**

On May 3, 2004, the Plaintiff, Donald J. Richard ("Richard") filed a verified complaint in which he sought to make an election pursuant to the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161(a) ("COBRA") for continuation of his coverage as a qualified beneficiary under the health insurance provided by his former employer, the Defendant Industrial Commercial Electrical Corporation ("ICE").

The parties appeared for trial before this Court, sitting without a jury, on August 2, 2004. After a two-day trial, the Court announced its finding in favor of the Plaintiff which it now supplements with written findings of fact and conclusions of law.

I. **Findings of Fact**

    1. Richard resides at 70 Gardner Road in Winchendon, Massachusetts.

2. ICE maintains its principal place of business at 14A Airport Drive in Hopedale, Massachusetts.

3. Richard became an employee of ICE's predecessor corporation, Industrial Commercial Electrical, Inc. ("old ICE") in August, 1991. ICE subsequently purchased the assets of old ICE in a bankruptcy proceeding pursuant to Chapter 11 of the United States Bankruptcy Code and is the successor in interest to old ICE. Richard became an employee of ICE at the time of the asset purchase in April 2003.

4. When Richard was initially employed by old ICE, he was a Foreman Data Technician working on communication and other low voltage systems. As a foreman he was responsible for supervising the job and the work performed. His role after the asset purchase by ICE remained the same but he was required to purchase and use his own vehicle which he had not been required to do by old ICE. Richard purchased a 1997 Ford truck for which he received from ICE a vehicle allowance of $115 per week plus 14¢ per mile after the initial 30 miles of his daily commute because his vehicle was to be used for company business.

5. As an employee of ICE, Richard reported to David LeBlanc, who was President of both old ICE and ICE, and to David's brother Dwayne LeBlanc, who was a Project Manager for both companies.

6. Richard's wife Claire suffers from Multiple Sclerosis, chronic obstructive pulmonary disease and depression, among other ailments. She requires substantial medication and medical care

which costs between $1,400 and $2,300 per month. At all times during his employment, Richard was covered under the family health insurance plan offered by ICE.

7. During March, 2004, ICE was in the process of moving its offices and warehouses from 9 Short Street in Worcester, Massachusetts to 14A Airport Drive in Hopedale, Massachusetts.

8. During the week ending March 20, 2004, Richard worked moving material from the Worcester location to the new location in Hopedale. Specifically, Richard drove from his home in Winchendon to Worcester to pick up and load into his truck filing cabinets, office modules, partitions, desks and countertops for transportation to Hopedale.

9. On either Wednesday, March 17 or Saturday, March 20, 2004, David LeBlanc directed Richard to pick up at the Worcester warehouse certain items that Mr. LeBlanc described as his personal property and deliver to Mr. LeBlanc's new apartment. At about that time, David LeBlanc asked Richard not to disclose the location of his apartment to anyone because of his pending marital difficulties with his wife.

10. Michael Scanlon began working for ICE in March 2004 and worked with Richard regularly.

11. After ICE's move to Hopedale was completed, Richard continued to perform his regular duties for ICE, including business trips to New York and New Jersey on electrical contracting jobs.

12. Karl Walsh ("Walsh") became the Treasurer and a member of

the Board of Directors of ICE when the company purchased the assets of old ICE pursuant to the Chapter 11 proceeding but Richard did not work with or report to him during Richard's employment at ICE.

13. On April 16, 2004, Dwayne LeBlanc told Richard that Walsh wanted to meet with Richard at Walsh's office. Dwayne LeBlanc drove Richard to Walsh's office because Richard was unfamiliar with its location.

14. At that meeting, which was also attended by William Burns ("Burns"), ICE's attorney and also a member of the Board of Directors, Walsh accused Richard of stealing from the company. After Richard denied that accusation, Burns told Richard that he was required to disclose David LeBlanc's home address. Either Burns or Walsh indicated that Richard's job with ICE was in jeopardy if he failed to comply.

15. Richard indicated that he did not know David LeBlanc's address but that he did know how to get to David's residence. Initially, Richard agreed to show Walsh where David lived but recanted 10 minutes later.

16. After learning of Richard's refusal to show Walsh where David LeBlanc lived, Walsh informed Richard that he had 10 minutes to reconsider or he would be fired.

17. Richard did not relent or inform Walsh about the location of David LeBlanc's residence and his employment with ICE was terminated that day (April 16, 2004). At the same time, at Walsh's direction, Richard's cellular telephone service was disconnected.

18. On April 21, 2004, Richard went to ICE's office to pick up his final paycheck. He met with attorney Burns who informed him that he had been terminated from ICE for stealing. Richard denied the allegation and requested the necessary paperwork to activate his COBRA benefits. Burns then informed Richard that ICE would not offer him COBRA coverage.

II. **Conclusions of Law**

1. This Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. § 1331 and the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").

2. Richard is entitled to participate in ICE's group health insurance program based upon 29 U.S.C. § 1161.

3. COBRA provides that, for a maximum of 18 months after the termination of employment, former employees and qualified dependents may elect to continue health care benefits provided by the employer. 29 U.S.C. § 1162.

4. The former employee must, however, pay for those benefits himself at a fixed cost that is governed by the COBRA statute. 29 U.S.C. § 1162(3).

5. The former employee becomes eligible for a COBRA election only after a qualifying event, which includes termination other than by reason of the employee's gross misconduct. 29 U.S.C. § 1163(2).

6. To justify a denial of COBRA benefits as a result of gross

misconduct, an employer must have more than an honest, actual belief that an employee engaged in such misconduct. See Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 680 (7th Cir. 1997). Rather, the record must reveal that the employee did in fact engage in gross misconduct, and "[a]ccuracy must take the place of honesty" with respect to an employer's suspicion of gross misconduct. Id. at 680, 681.

7. COBRA does not provide a definition of "gross misconduct" and "federal case law addressing the issue is sparse." Cotte v. Cooperative de Ahorro y Credito Yabucoena, 77 F. Supp.2d 237, 241 (D.P.R. 1999). While some courts have looked to state law for guidance as to the definition of gross misconduct, see Paris v. F. Korbel & Bros., Inc., 751 F. Supp. 834, 838 (N.D. Cal. 1990), others have applied the ordinary meaning of the statutory terms. See Zickafoose v. UB Services, Inc., 23 F. Supp.2d 652, 655 (S.D. W. Va. 1998).

8. Without a definition of gross misconduct under Massachusetts law that is appropriate in the employment context, the Court is left to divine such a definition from Massachusetts law in other contexts and federal case law from other jurisdictions.

9. In a case involving the disciplinary sanction of a doctor for gross misconduct, the Massachusetts Supreme Judicial Court defined that term as "willed and intentional" conduct that is "flagrant and extreme" and "out of all measure; beyond allowance;

-6-

not to be excused; flagrant; shameful...." Hellman v. Bd. of Registration in Med., 404 Mass. 800, 804, 537 N.E.2d 150, 152 (1989), citing State ex rel. Gremillion v. O'Hara, 252 La. 540, 557, 211 So.2d 641, 648 (1968); Webster's New International Dictionary 1106 (2d ed. 1959). Such misconduct is "more than that conduct which comes about by reason of error of judgment or lack of diligence[,]" but rather "involves intentional wrongdoing or lack of concern for one's conduct." Hellman, 404 Mass. at 804, 537 N.E.2d at 152, citing O'Hara, 252 La. at 557, 211 So.2d at 648. This Court must determine whether an act constitutes gross misconduct based upon "the facts surrounding the act, the nature of the act, and the intention of the actor." Id.

10. Similarly, United States district courts in other jurisdictions have held that gross misconduct, for purposes of §1163(2), is conduct that "is so outrageous that it shocks the conscience." Cotte v. Cooperativa de Ahorro y Credito Yabacoena, 77 F. Supp.2d 237, 241 (D.P.R. 1999); Zickafoose v. UB Services, Inc., 23 F. Supp.2d 652, 655 (S.D.W. Va. 1998).

11. In the instant case, ICE has failed to establish that Richard's actions constituted gross misconduct under any definition of that term contemplated by Massachusetts law or federal case law.

12. During the course of ICE's move in March, 2004, Richard continued to adhere to the orders of David LeBlanc, the President of ICE to whom, directly and through David's brother Dwayne, Richard had reported since he began work with old ICE in 1992.

13. ICE has failed to establish that Richard was apprised, orally or otherwise, before April 16, 2004, that he was to take orders from Mr. Walsh (the "Treasurer") rather than from David LeBlanc (the "President").

14. Richard could have reasonably believed that 1) work performed on behalf of David LeBlanc inured to the benefit of ICE and 2) David did not want his home address revealed for legitimate personal reasons that were not adverse to the good of the company.

15. Richard did not intend to harm ICE by performing work on behalf of David LeBlanc, whether during or after normal work hours, and, based upon Massachusetts state law and federal case law, his conduct during the course of his employment did not amount to gross misconduct.

## III. Conclusion

The record of this case reveals that the underlying dispute surrounding this case actually exists between the former management of ICE (the LeBlancs) and the new management of ICE (represented in this instance by Karl Walsh). Mr. Richard unwittingly became a pawn in that dispute and Mr. Walsh attempted to use Richard's relationship with David LeBlanc to explore LeBlanc's potential wrongdoing. If Richard engaged in any misconduct, which is doubtful, it clearly was not gross and did not warrant a denial of Richard's COBRA benefits. Accordingly, judgment will enter for Richard and he will be permitted to make his COBRA election.

Pursuant to 29 U.S.C. § 1132(g), Richard is entitled to an award of reasonable attorney's fees and costs. On August 9, 2004, Richard's counsel submitted an affidavit in which he seeks attorney's fees in the amount of $19,062 and costs of $172. Considering the nature and relative simplicity of this case, the proposed amount of attorney's fees appears somewhat excessive. Thus, Richard is entitled to attorney's fees of $15,250 and costs of $172 for a total of $15,422. That amount will be awarded to Plaintiff by the Defendant.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated: August 20, 2004

*Robert Weihrauch*
*Attorney at Law*
*446 Main Street*
*20th Floor*
*Worcester, Massachusetts 01608*

Tel. (508) 752-7...
Fax (508) 799-0...

August 23, 2005

William J. Burns, Esquire
1001 North Main Street
Randolph, MA   02368

Re:  Richard v. Industrial Commercial Electrical Corporation
      Civil Docket # 04-40066-NMG

Dear Mr. Burns:

In accordance with the decision of the Court, a copy of which is attached, demand is hereby made for payment in the amount of $15,422 for Attorney's fees and costs and interest.

Very truly yours,

Robert Weihrauch
RW/bw
Enclosure

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**FIRST EXECUTION**                    CIVIL ACTION NO. 04-40066-NMG

To the United States Marshal for the District of Massachusetts or either of his Deputies and to _____, Special Process Server:

WHEREAS ___Donald J. Richard___ has recovered judgment against ___Industrial Commercial Electrical Corporation___ on the __20th__ day of __August 2004__, for the sum of $__15,250.00__, debt or damage, pre-judgment interest in the amount of $_____, and costs of this suit in the amount of $__172.00__, as to us appears of record, whereof this First Execution remains to be done,

WE COMMAND YOU, therefore, that of the goods and chattels or lands of the said Judgment Debtor, to cause to be paid and satisfied unto the said Judgment Creditor, at the value thereof in money, the aforesaid sums, being a total of $__15,442.00__, in the whole, with interest thereon at the rate of ____ from said day of rendition of said judgment; and thereof also to satisfy yourself for your own fees.

HEREOF FAIL NOT and make due return of this Writ with your doings thereon into the Clerk's Office of our said court, at __Boston__, Massachusetts, within Twenty (20) years after the date of said judgment, or within Ten (10) days after this Writ has been satisfied or discharged.

Dated this __18th__ day of __October 2005__.

SARAH A. THORNTON
CLERK OF COURT

SEAL

By: _____
Deputy Clerk

(Execution 1st.wpd - 3/7/2005)